## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| KEVIN LYNN THAYER, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| | Case No. 2:05-CV-1004 DB |
| v. | |
| STATE OF UTAH et al., | District Judge Dee Benson |
| Defendants. | Magistrate Judge Brooke Wells |

Plaintiff, Kevin Lynn Thayer, an inmate at the Utah State Prison, filed this *pro se* civil rights suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2009). Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C. § 1915(b). *See* 28 *id.* 1915. On September 21, 2006, this case was dismissed based on Plaintiff's apparent failure to pay the initial partial filing fee as directed. On appeal to the Tenth Circuit, however, Plaintiff produced evidence showing that he had, in fact, paid the required fee and the case was remanded for further proceedings. This case is now before the Court for screening of Plaintiff's Complaint under 28 U.S.C. § 1915(e).

### ANALYSIS

### I. Screening Standard

Under 28 U.S.C. § 1915(e)(2)(B), a court shall dismiss any

claims in a complaint filed *in forma pauperis* if they are
frivolous, malicious or fail to state a claim upon which relief
can be granted.  "Dismissal of a pro se complaint for failure to
state a claim is proper only where it is obvious that the
plaintiff cannot prevail on the facts he has alleged and it would
be futile to give him an opportunity to amend." *Perkins v. Kan.
Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999).  For
screening purposes, the Court "presumes all of plaintiff's
factual allegations are true and construes them in the light most
favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106,
1109 (10th Cir. 1991).

Because Plaintiff is proceeding pro se the Court must
construe his pleadings liberally and hold them to a less
stringent standard than formal pleadings drafted by lawyers. *Id.*
However, "[t]he broad reading of the plaintiff's complaint does
not relieve [him] of the burden of alleging sufficient facts on
which a recognized legal claim could be based." *Id.*  While
Plaintiff need not describe every fact in specific detail,
"conclusory allegations without supporting factual averments are
insufficient to state a claim on which relief can be based." *Id.*

To state a viable claim "[t]he complaint must plead
sufficient facts, taken as true, to provide 'plausible grounds'
that discovery will reveal evidence to support the plaintiff's

allegations." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007)). The requirement of plausibility serves "not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Id.* at 1248. And, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for [his] claims." *Ridge at Red Hawk, L.L. C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

## II. Plaintiff's Allegations

The events leading to this lawsuit occurred while Plaintiff was housed as a state inmate at the Purgatory Correctional Facility (PCF), a jail operated by the Washington County Sheriff's Office in Hurricane, Utah. Plaintiff states that he is gay/bisexual and is a convicted sex offender. Plaintiff was transferred to PCF on March 14, 2003, to participate in the Sex Offender Treatment Program (SOTP). Plaintiff's Complaint alleges the following facts as support for his claims.

### A. Suntanning Incident

On May 24, 2003, Plaintiff went to the PCF main yard for recreation.  Plaintiff was wearing a pair of "sweatshorts" which had been torn or altered for suntanning.  Defendants Vernon and Wellhoff were supervising approximately fifty inmates on the recreation yard at the time.  According to documents included as exhibits to Plaintiff's Complaint, Vernon and Wellhoff both observed Plaintiff bend over to do something, exposing his bare buttocks in the process.  (Compl. Ex. 6.)  According to Vernon and Wellhoff "it looked as though [Plaintiff] had nothing on underneath [his altered shorts]."  (Compl. Ex. 6 at 1-2).  Plaintiff was confronted by Defendant Vernon and ordered to put on appropriate gym shorts.  Plaintiff complied immediately.  About ten minutes later, Vernon again confronted Plaintiff and another inmate, Charles Hughes, as Hughes was applying sunscreen lotion to Plaintiff's back.  Vernon stated that Plaintiff and Hughes were involved in "inappropriate contact" and directed them to stop.  Plaintiff was allowed to remain on the yard for the remainder of the recreation period.  Later, as Plaintiff was returning to his cell block, Defendant Wellhoff announced over the dorm speakers that she wanted Plaintiff's "cute little skirt"--referring to Plaintiff's altered shorts--and instructed Plaintiff to bring them to the control room where Defendants Wellhoff, Hallman and Moore were stationed.  Plaintiff brought the shorts to the control room and was instructed to leave them

on the floor where he stood, to which he replied, "Okay, but I don't think they'll fit you."  Hallman and Moore allegedly laughed and Wellhoff yelled, "I didn't want them to fit me!" Approximately thirty minutes later Plaintiff and inmate Hughes were called to the corridor where Hallman told them they were being written up and moved to punitive isolation for engaging in inappropriate sexual contact.

Later the same day, Defendant Wellhoff served Plaintiff with a formal disciplinary writeup listing four infractions: (1) VC-2-U directing or making obscene gestures or using derogatory language toward staff; (2) VC-2-W engaging in or encouraging others to engage in sexual activities; (3) VC-2-R manipulation of housing assignment by use of violent, threatening, or disruptive behavior; and, (4) VC-2-S disorderly conduct, reckless endangerment.

### B. Investigation and Hearing

On May 31, 2003, Defendants Wiegert and Timbrel met with Plaintiff to investigate the disciplinary charges against him. Although Plaintiff was told that the meeting was just "a friendly chat" Plaintiff was read his *Miranda* rights and signed a waiver acknowledging that criminal charges could result from any information he provided.  Wiegert then questioned Plaintiff regarding alleged "homosexual activities" on the cell block.

Weigert stated that Defendants Wellhoff and Vernon had reported that Plaintiff had not been wearing any underwear with his altered shorts while in the yard and had exposed himself. Although Plaintiff denied these allegations Weigert instructed another officer, Defendant Keil, to conduct a strip search of Plaintiff to look for tan lines.  According to Weigert's incident report Plaintiff "agreed to show Deputy Keil his upper thigh area and buttocks and there were no visable [sic] tan lines." (Compl. Ex. 6 at 4.)  Weigert further states that "this check was done with Inmate Thayer's permission and in the privacy of the shower in the cell block." (Compl. Ex. 6 at 4.)  Plaintiff subsequently filed a grievance regarding this search which was denied by Defendants Cannon and Lambert.

On June 3, 2003, Plaintiff appeared for a disciplinary hearing before Defendant Moriarty.  Plaintiff was found guilty of VC-2-U making obscene gestures or using derogatory language toward staff; and, VC-2-S disorderly conduct, reckless endangerment.  The remaining two disciplinary charges were dismissed.  During the hearing Plaintiff attempted to dispute Moriarty's findings and asked to see the actual witness statements or other evidence against him, however, Moriarty allegedly stated that she had "some evidence" to support her findings and wasn't obligated to disclose the specifics to

Plaintiff.  Moriarty then sentenced Plaintiff to thirty days lockdown in B-block followed by up to thirty days partial lockdown in A-block.

### C. Criminal Charge

The same day as the disciplinary hearing, based on a probable cause statement filed by Defendant Weigert, Plaintiff was booked by the Washington County Sheriff's Office on a criminal charge of Lewdness, a Class B Misdemeanor, under Utah Code § 76-9-702.  An Information was filed on June 9, 2003. Plaintiff was arraigned in the Hurricane City Justice Court on June 25, 2003, pled not guilty, and was appointed counsel.  On August 7, 2003, the Hurricane City Prosecutor, Christopher W. Edwards, moved to dismiss the charge against Plaintiff due to "insufficient evidence."  The case was dismissed on August 14, 2003.  Almost two years later, in response to inquiries from Plaintiff, Edwards wrote a letter to Plaintiff explaining that "the basis for the motion to dismiss was that because of the nature of the alleged offense and because of the necessary cooperation of others to testify, I exercised my prosecutorial discretion and decided that I did not want to pursue the matter for trial."  (Compl. Ex. 13 at 5.)

Plaintiff alleges that on June 6, 2003, three days following his disciplinary hearing and booking, fifteen inmate witnesses

came forward wishing to make sworn statements in Plaintiff's
defense.  Plaintiff alleges that these inmates requested notary
services from Defendant Moriarty, one of the notaries at PCF, but
she refused based on her personal involvement with Plaintiff's
disciplinary proceeding.  Moriarty allegedly told the inmates
that another notary would be found to assist them but none was
ever provided.  The inmate witnesses eventually resorted to
routing their unsworn affidavits to Plaintiff through the prison
contract attorneys.  The contract attorneys also wrote a letter
to PCF officials explaining that witness affidavits were required
to be notarized to be admissible in evidence.  (Compl. Ex. 10 at
2.)  Plaintiff filed grievances regarding the notary issue which
were denied by Defendants Cannon and Lambert.  In denying
Plaintiff's final grievance appeal Lambert stated that the
failure to provide notarization did not deny Plaintiff legal
access because Plaintiff's appointed counsel would "most likely"
have the witnesses testify in person.  Lambert stated, however,
that officials would work with Plaintiff's appointed attorney "as
he attempts to collect evidence for [Plaintiff's] case."  (Compl.
Ex. 1.3 at 4.)

### D. Lockdown

Plaintiff alleges that he was forced to serve approximately
two extra days on lockdown due to a miscalculation by Defendant

Moriarty and jail officials' refusal to promptly address the
mistake.  Plaintiff states that his thirty-day disciplinary
lockdown on B-block should have expired on June 23, 2003.  On the
afternoon of June 24, 2003, Plaintiff asked Defendant Hallman
when he would be transferred to A-block and Hallman stated,
"We'll think about it."  An hour later Plaintiff inquired again
and was told that Moriarty was responsible for terminating
Plaintiff's disciplinary confinement and she was not available at
the moment.  After another hour Plaintiff inquired again and
Defendant Farnsworth allegedly yelled over the cell speaker, "I
am tired of hearing from you, Mr. Thayer.  If you ask again, I'll
keep you locked down another day."  Farnsworth later told
Plaintiff that disciplinary lockdown was normally terminated at
midnight and that Plaintiff would be transferred that night.
However, Defendants Mrkvicka, Robinson and Larsen, who were
working the graveyard shift that night, failed to move Plaintiff.
Plaintiff's lockdown was not terminated until June 25, 2003,
about an hour before Plaintiff's arraignment in the Hurricane
City Justice Court.  Plaintiff filed grievances about the issue
and Defendant Standley responded stating that Plaintiff should
have come off lockdown on June 23rd but there was a
miscalculation due to the fact that May has thirty-one days.
Standley stated that to remedy the mistake one day would be

deducted from Plaintiff's time in A-block.  (Compl. Ex. 1.4 at 2.)

### E. Assault Incident

On July 19, 2003, an inmate in the cell next to Plaintiff was assaulted.  Plaintiff states that he was asleep at the time of the assault and was not involved.  Immediately after the assault was reported the entire cell block was locked down.  A short time later Plaintiff received a formal disciplinary writeup charging him with the assault.  Simultaneously, the remainder of the cell block was released from lockdown while Plaintiff and his cellmate were kept in their cell.  Plaintiff made numerous requests to speak with officials about the incident but was ignored.  Plaintiff remained on lockdown until a formal disciplinary hearing was held on the matter on July 24, 2003. During the hearing the charges against Plaintiff were dismissed and he was restored to regular housing.  Plaintiff asserts that jail officials knew early on that Plaintiff was not involved in the assault but kept him on lockdown for five days as retaliation for filing grievances and records requests.  Following dismissal of the assault charge Plaintiff filed additional grievances and records requests which were denied.  On September 10, 2003, Plaintiff was transferred back to the Utah State Prison in Draper, Utah, and was removed from the SOTP waiting list.

Plaintiff asserts that his transfer was further retaliation for filing grievances and records requests.

### F. OMR Hearing

On October 29, 2003, Plaintiff went before the Offender Management Review (OMR) committee at USP for reevaluation of his privilege level, housing unit and programming requirements. Based on Plaintiff's removal from the SOTP waiting list the OMR committee reduced Plaintiff's privilege level and placed him in a more restrictive housing unit (Oquirrh III). Plaintiff states that he attempted to obtain additional notarized witness statements from inmates at PCF in order to appeal the OMR decision, however, PCF officials continued to interfere with his legal mail. Plaintiff states that PCF staff "illegally intercepted, opened, perused and investigated" correspondence from Plaintiff to PCF inmates. Plaintiff subsequently filed additional grievances about this alleged interference which were also denied.

### III. Sufficiency of Complaint

Plaintiff's Complaint alleges four broad causes of action: (1) denial of due process in violation of the Fifth and Fourteenth Amendments; (2) denial of access to the courts in violation of the First, Fifth and Fourteenth Amendments; (3) denial of equal protection of the laws under the Fourteenth

11

Amendment; and, (4) cruel and unusual punishment under the Eighth Amendment.  The Complaint names as defendants the State of Utah, employees of the Utah Department of Corrections, Washington County, Utah, the Washington County Sheriff, and numerous employees of the Washington County Sheriff's Office.  Plaintiff seeks a range of declaratory and injunctive relief as well as compensatory and punitive damages.

### A. Due Process

Count One of the Complaint asserts that Plaintiff was denied both procedural and substantive due process in violation of the Fifth and Fourteenth Amendments.  Although Plaintiff does not clearly define each of his due process claims the Complaint appears to raise the following issues.  First, Plaintiff challenges the legality of the investigation conducted by PCF officials, including the interrogation and search of Plaintiff's person.  Second, Plaintiff challenges the sufficiency of the PCF disciplinary hearing and appeals process, including the adequacy of the written notice provided to Plaintiff, the opportunity afforded Plaintiff to present evidence in his defense, the impartiality of the hearing officers, and the sufficiency of the written statement explaining the outcome of the hearing.  Third, Plaintiff challenges the OMR proceeding which resulted in loss of privileges and a more restrictive housing assignment.  Fourth,

Plaintiff alleges that he was confined in lockdown for an extended time without due process.  Finally, Plaintiff challenges the legality of the criminal charge filed against him which was ultimately dismissed.

As an initial matter, Plaintiff does not clearly state which of the above actions allegedly violated substantive due process standards.  The Tenth Circuit has held, however, that substantive due process analysis is disfavored if the claim can be analyzed under "an explicit textual source of constitutional protection." *Seegmiller v. LeVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008)). Because it appears that each of Plaintiff's claims can be properly analyzed under specific constitutional provisions, resort to "the more generalized notion of substantive due process" is unnecessary here.  *See Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994).  Thus, rather than applying substantive due process analysis, the Court will analyze each of Plaintiff's due process claims under the constitutional framework deemed most appropriate.

### i. Interrogation and Search

Plaintiff asserts that his civil rights were violated during the investigation into the incident on the recreation yard and the alleged "homosexual activities" on Plaintiff's cell block. Plaintiff specifically challenges the legality of his

13

interrogation and the search of his person.

Regarding the interrogation, Plaintiff asserts that Weigert and Timbrell violated Plaintiff's right against compelled self-incrimination by falsely portraying the interrogation as merely "a friendly chat."  Plaintiff further states that he was not fully informed of the seriousness of the allegations against him, that he was not aware disciplinary or criminal charges might result, and that he was essentially tricked into signing the *Miranda* waiver.

The Fifth Amendment prohibits any person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  This prohibition "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426, 104 S. Ct. 1136 (1984) (quoting *Lekowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, (1973)).  It is well settled that prisoners do not forfeit their privilege against compelled self-incrimination as a result of their conviction or confinement.  *Id.* at 426.

Plaintiff has not alleged any facts showing that the waiver

14

of his Fifth Amendment privileges was made unknowingly or involuntarily.  Despite Plaintiff's assertion that he was ignorant as to the seriousness of the investigation, Plaintiff admits that he understood the waiver form which clearly spelled out his *Miranda* rights and stated that criminal charges could result from any statements he made.  Moreover, Plaintiff admits that despite understanding his rights he voluntarily, albeit naively, agreed to answer questions.  Plaintiff's sole allegation of deception is that the interrogation was initially portrayed as "a friendly chat" and, therefore, he did not expect criminal charges would result.  While this characterization may have been misleading, any false notions Plaintiff might have had regarding the true nature of the conversation would have been dispelled when Plaintiff was asked to sign a *Miranda* waiver.  As far as Plaintiff's expectations regarding the likelihood of criminal charges, the Supreme Court has held that "the Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 857 (U.S. 1987).  Thus, based on the allegations in the Complaint and the attached exhibits the Court concludes that Plaintiff's allegations regarding his interrogation fail to show a Fifth Amendment violation.

The Court now turns to Plaintiff's claim that the alleged "strip-search" conducted by Defendant Kiel, on Weigert's instructions, violated the Fourth Amendment.[1]  In his grievances Plaintiff asserted that the search violated the standards set out by the Supreme Court in Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979).[2]  Responding to Plaintiff's initial grievance, Defendant Cannon stated: "You are a state inmate.  As such, you are subject to search at any time deemed appropriate by staff. The staff were functioning 'in the interest of a legitimate penological interest' (that is your Bell vs. Wolfish)."  (Compl. Ex. 1.1 at 3.)  This reasoning was upheld by Defendant Lambert in denying Plaintiff's final grievance appeal.  (Compl. Ex. 1.1 at 6.)  Plaintiff's Complaint challenges this reasoning and asserts that the search "was certainly unreasonable and probably unconstitutional."  (Compl. at 24.)

---

[1]  Plaintiff's characterization of the search as a compulsory "strip-search" differs significantly from the description in Weigert's incident report.  Nevertheless, because for screening purposes the allegations in the Complaint must be construed in the light most favorable to Plaintiff, the Court will accept Plaintiff's characterization here.

[2]  The Court notes that Bell involved strip searches of "pretrial detainees--those persons who have been charged with a crime but who have not yet been tried on the charge," rather than individuals like Plaintiff who are convicted inmates in the general prison population.  Bell, 441 U.S. at 523, 99 S. Ct. 1861.

It is well established that prison inmates retain a privacy interest in the integrity of their own persons. *Dunn v. White, 880 F.2d 1188, 1191 (10th Cir. 1989), cert. denied,* 493 U.S. 1059, 110 S. Ct. 871 (1990). Moreover, the traditional Fourth Amendment prohibition against unreasonable searches extends to personal body searches of inmates. *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S. Ct. 1861, 1884 (1979). Determining the reasonableness of an inmate strip search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell,* 441 U.S. at 559, 99 S. Ct. at 1884. This in turn requires courts to evaluate "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* To be justified a search must be reasonably related to legitimate penological interests. *Dunn,* 880 F.2d at 1194.

Plaintiff asserts that the search of his person was not reasonably related to a legitimate penological interest but was an unreasonable attempt to gather circumstantial evidence to support a false criminal charge against him. The Court disagrees. Plaintiff admits that he was observed on the recreation yard wearing torn or altered shorts and that he was told to put on appropriate gym clothes because the modified

shorts were inappropriate.  Moreover, the exhibits to Plaintiff's Complaint show that multiple officers observed Plaintiff exposing his buttocks while on the yard and that officers also received complaints from other inmates.  These facts clearly gave PCF officials reasonable suspicion that Plaintiff routinely violated prison regulations by exposing his buttocks while sunbathing on the recreation yard.  Given that such behavior could jeopardize institutional security, PCF officials had a legitimate penological interest in investigating the matter further and taking disciplinary action.

The visual body search of Plaintiff was directly related to investigating the frequency and extent of Plaintiff's suspected inappropriate conduct.  In the prison context, the presence of an obvious suntan on areas of the body that cannot be exposed in public, such as the buttocks, may be circumstantial evidence of possible lewd conduct which could threaten institutional security.  Defendants could have reasonably inferred, based on Plaintiff's extended incarceration and lack of opportunity to sunbathe in private, that the location or absence of tan lines might indicate whether Plaintiff was exposing his buttocks while tanning on the recreation yard.  The fact that the search proved to be inconclusive does not mean that it was unreasonable.  Thus, the Court concludes that the search here was justified as

reasonably related to a legitimate penological interest in maintaining institutional security.[3]

The Court further finds that the scope of the intrusion, the place where the search occurred, and the manner in which it was conducted, also support the conclusion that the search here was reasonable. Plaintiff's statement that during the search he was required to "show Kiel his buttocks" is entirely consistent with the stated purpose for the search, namely, to determine whether Plaintiff exposed his buttocks while sunbathing. Plaintiff does not allege that he was subjected to an unnecessary cavity search or other unnecessarily invasive procedure. Moreover, Plaintiff does not dispute that the search was performed in a reasonable manner in a private area out of view of other inmates. Each of these factors strongly support the reasonableness of the instant search.

Thus, the Court concludes that Plaintiff's allegations

---

[3] Although the search alleged here was reasonable under the Fourth Amendment, the Court questions whether it was truly necessary. Given the low burden of proof required for prison disciplinary sanctions, and the fact that officers personally observed inappropriate conduct, it appears likely that any safety or security threat presented here could have been rectified without the need for an intensive investigation or the instant search. Nevertheless, the Court recognizes that the opinions of prison administrators regarding how to maintain internal security are entitled to considerable deference. *See Mitchell v. Maynard*, 80 F.3d 1433, 1443 (1996).

regarding the visual body search fail to state a claim under the
Fourth Amendment.

### ii. Disciplinary Hearing and Appeals

Plaintiff next challenges the sufficiency of the PCF
disciplinary hearing and appeals process.  Plaintiff asserts that
we was denied due process based on inadequate written notice of
the charges against him, denial of adequate opportunity to
present evidence in his defense, the lack of impartial hearing
officers, and the insufficiency of the written statement
explaining the outcome of the hearing.  Plaintiff also asserts
that the failure to timely remove him from disciplinary lockdown
violated due process.

The Supreme Court has held that "[p]rison disciplinary
proceedings are not part of a criminal prosecution, and the full
panoply of rights due a Defendant in such proceedings does not
apply." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S. Ct. 2963,
2975 (1974).  Only when a disciplinary proceeding threatens a
constitutionally protected liberty interest is a prisoner
guaranteed due process under the Federal Constitution.  *Id.*  And,
even where protected liberty interests are implicated, prisoners
are only entitled to the "the minimal safeguards afforded by the
Due Process Clause of the Fourteenth Amendment." *Mitchell v.
Maynard*, 80 F.3d 1433, 1444 (10th Cir. 1996) (quotation marks and

citations omitted.)  These minimal safeguards require that a
prisoner receive advance written notice of the charges against
him, the right to call witnesses and present evidence in his own
defense *if doing so does not jeopardize institutional safety or
correctional goals*, and a written statement indicating the
evidence relied on and the reasons supporting the disciplinary
action." *Caserta v. Kaiser*, No. 00-6108, 2000 WL 1616248, at *2
(10th Cir. Oct. 30, 2000) (Emphasis added).  Although prison
rules may include additional procedural guidelines for
disciplinary hearings, an inmate cannot rely upon those rules to
state a due process claim under the Federal Constitution because
"state procedures do not define what is required under federal
due process."  *Glatz v. Kort*, 807 F.2d 1514, 1517 n. 4 (10th
Cir. 1986).

Even assuming that the disciplinary proceeding challenged
here implicated a constitutionally protected liberty interest,
Plaintiff's allegations do not show that he was denied the
minimally required due process.  Plaintiff admits that he
received formal written notice of the specific charges against
him on May 24, 2003, ten days prior to this his disciplinary
hearing on June 3, 2003.  Plaintiff also admits that he received
a formal hearing where he had an opportunity to respond to the
charges.  Plaintiff does not allege specific facts showing that

21

the hearing officers in this case were biased.  Although
Plaintiff alleges that Moriarty refused Plaintiff's request to
see the actual witness statements against him, Plaintiff does not
dispute the existence of the incriminating statements, nor does
he allege facts showing that the statements were unreliable.
Finally, Plaintiff admits receiving a written Disciplinary
Hearing Disposition form which stated that the evidence relied on
to find Plaintiff guilty was the "deputies reports & interview
with inmate that was involved." (Compl. Ex. 7 at 2.)  Although
this description is somewhat terse, it is sufficient to inform
Plaintiff of the evidence relied on and the reasons supporting
the disciplinary action taken.

On appeal from the disciplinary hearing Plaintiff argued
that he was denied due process based on the lack of compulsory
process for presenting witnesses, denial of counsel, admission of
hearsay evidence, and failure to meet the burden of proof.[4]
(Compl. Ex. 8.)  These objections clearly reveal Plaintiff's
misapprehension of the due process requirements and standard of
proof applicable to prison disciplinary proceedings.  Plaintiff's

---

[4]  While Plaintiff appears to concede that there was "some
evidence" to support his guilt he apparently believes he was
entitled to a full-blown criminal-trial type proceeding.  As the
Supreme Court has recognized, however, such safeguards are not
required in the prison disciplinary setting.

assertion that hearsay evidence is per se inadmissible and that compulsory process and appointed counsel are required for prison disciplinary proceedings is incorrect.  The Supreme Court has stated that ascertaining whether minimal due process has been afforded in prison disciplinary proceedings "does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence.  Instead, the relevant conclusion is whether there is any evidence that could support the conclusion reached by the disciplinary board." *Superintendent, Mass, Corr. Inst. v. Hill*, 472 U.S. 445, 454, 105 S. Ct 2768, 2773 (1995).  Moreover, the decision can be upheld even if the evidence supporting the decision is "meager".  *Id.* at 457, 105 S. Ct. at 2775.  The record here clearly shows that there was "some evidence" to support the conclusion reached by the disciplinary board.

Thus, the Court concludes that Plaintiff's Complaint fails to state a claim for denial of due process in relation to prison disciplinary proceedings.

### iii. Removal from SOTP and OMR Proceedings

Plaintiff alleges that he was removed from the SOTP waiting list without due process.  Plaintiff further alleges that because of his removal from the SOTP waiting list the OMR committee reduced his privilege level and transferred him to a less

23

desirable housing unit.

"The Due Process Clause guarantees due process only when a person is to be deprived of life, liberty, or property." *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994). Thus, the first step in evaluating a due process claim is to determine whether the allegations implicate liberty or property interests protected under the U.S. Constitution. It is well established that prisoners have no right under the Federal Constitution to any specific classification or housing assignment. *See Hewitt v. Helms*, 459 U.S. 460, 468, 103 S. Ct. 864, 869 (1983); *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994); *Levoy v. Mills*, 788 F.2d 1437, 1440 (10th Cir. 1986). "Changing an inmate's prison classification ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison." *Templeman*, 16 F.3d at 369. Reclassification will implicate a protected liberty interest only where it imposes an "atypical or significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 485, 115 S. Ct. 2293, 2301 (1995), or threatens to lengthen his term of confinement, *id. at 487*.

Plaintiff cannot show that his reclassification or removal from SOTP imposed an "atypical or significant" hardship on him or lengthened his term of confinement. Although Plaintiff may have

24

been denied certain privileges following his removal, the regime to which he was subjected as a result of his reclassification was clearly "within the normal limits or range of custody which [his] conviction . . . authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225, 96 S. Ct. 2532, 2538 (1976); *see also Sandin*, 515 U.S. at 487.

Even assuming that Plaintiff's removal from the SOTP waiting list affected his parole date Plaintiff cannot show that it lengthened his term of confinement. The Supreme Court has explicitly stated that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S. Ct. 2100, 2104 (1979). Moreover, Utah's parole statutes do not create a liberty interest entitling prisoners to federal constitutional protection. *See Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994). This is because under Utah's indeterminate sentencing scheme convicts are sentenced to a statutorily prescribed maximum term and the parole board has broad discretion to decide whether parole should be granted prior to the expiration of the legally imposed sentence. Plaintiff cannot show that removal from SOTP will cause him to be imprisoned beyond the maximum term of his sentence. Thus, Plaintiff's assertion that removal from SOTP may

25

negatively affect his chances for parole is insufficient to state a claim under § 1983.

It is also settled law that prisoners do not have a constitutional right to participate in rehabilitation programs. "Courts have not accepted the claim that an inmate has a constitutional right to any educational, or other programs, and there has never been a recognized constitutional right of rehabilitation for prisoners." *Termunde v. Cook, 684 F. Supp. 255, 259 (D. Utah 1988)*; *see also Johnson v. Galli, 596 F. Supp. 135, 159 (D. Nev. 1984)* ("There is no constitutional right to rehabilitation; idleness and a lack of programs do not violate the Constitution."). Nor can enrollment in such programs be described as a constitutionally protected liberty or property interest because "no fixed set of criteria entitles anyone to admission, and exclusion leaves the prisoner with the normal attributes of confinement." *Stanley v. Litscher, 213 F.3d 340, 342 (7th Cir. 2000)*. Thus, removal from the SOTP waiting list did not, by itself, violate Plaintiff's constitutional rights.

In sum, because Plaintiff's removal from SOTP, privilege level reduction and housing transfer did not deprive him of any liberty to which he was entitled under the federal Constitution, "no particular process was constitutionally due or required, regardless of state law." *Templeman, 16 F.3d at 371*. Thus, the

26

Court concludes that Plaintiff's allegations regarding removal from SOTP and the OMR process are insufficient to state a claim under the Due Process Clause.

### iv. Extended Lockdown

Plaintiff asserts that the failure to promptly remove him from lockdown upon expiration of his disciplinary sentence, and the five-day lockdown he experienced during the investigation into the assault in an adjoining cell, amounted to a denial of due process.  Plaintiff has not alleged sufficient facts to show that the conditions during either of these relatively brief "lockdown" periods were so harsh as to amount to an atypical or significant hardship.

In the first instance Plaintiff was kept on lockdown in B-block for approximately one day after he should have been transferred to partial lockdown in A-block.  The circumstances surrounding this incident show that it occurred due to a reasonable miscalculation of the time to be served and logistical problems correcting the error.  Moreover, after realizing their error jail officials compensated for the mistake by reducing Plaintiff's time on partial-lockdown.  Plaintiff cannot show that the difference in conditions between lockdown in B-Block and partial lockdown in A-Block are so extreme that one additional day in B-Block would amount to a deprivation of constitutional

27

magnitude.

The same is true regarding Plaintiff's "lockdown" in his regular cell during investigation of the assault incident. According to the Complaint Plaintiff and his cellmate were confined to their cell for approximately five days while officers investigated an assault which occurred in an adjoining cell. Plaintiff admits that this restricted confinement was administrative and not punitive in nature.  Moreover, although Plaintiff describes this as "lockdown" it appears that he remained in his cell on A-Block with his cellmate and was allowed to retain whatever personal property he had in his possession. Given the non-punitive nature of this restricted confinement, the relative freedom compared to lockdown in disciplinary segregation, and the relatively short duration involved, the Court finds that Plaintiff's allegations do not show the type of atypical or significant hardship required to state a due process claim.

### v. Malicious Prosecution

Plaintiff asserts that the filing of a misdemeanor lewdness charge against him without sufficient evidence to convict him amounted to a denial of due process in violation of the Fourteenth Amendment.  Because the charge was eventually dismissed the Court construes Plaintiff's allegations as a claim

for malicious prosecution.

The Tenth Circuit has recognized that a malicious prosecution claim may be cognizable under § 1983 and that the common law elements of malicious prosecution are the "starting point" for analysis of such a claim. *Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996)*. "Although the common law tort serves as an important guidepost for defining the constitutional cause of action, the ultimate question is always whether the plaintiff has alleged a constitutional violation." *Pierce v. Gilchrist, 359 F.3d 1279, 1289 (10th Cir. 2004)*. The constitutional right at issue in the context of a § 1983 malicious prosecution claim is the Fourth Amendment right to be free from unreasonable seizures. *See Taylor, 82 F.3d at 1561-62.* A seizure is "unreasonable" when it is made without probable cause. *United States v. Traxler, 477 F.3d 1243, 1246 (10th Cir. 2007)*. Thus, to establish a § 1983 claim for malicious prosecution, Plaintiff must show that Defendants lacked probable cause to file charges against him. *See Taylor, 82 F.3d at 1561* (evaluating the plaintiff's malicious prosecution claim by first determining whether probable cause supported the plaintiff's arrest).

"Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably

trustworthy information are sufficient to warrant a prudent
[officer] in believing that an offense has been or is being
committed." *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985).
This is an objective standard; the subjective belief of an
individual officer as to whether there is probable cause is not
dispositive. *United States v. Davis*, 197 F.3d 1048, 1051 (10th
Cir. 1999).  Importantly, probable cause does not require facts
sufficient for a finding of guilt. *United States v. Soto*, 375
F.3d 1219, 1222 (10th Cir. 2004).

Plaintiff was charged with one count of lewdness under Utah
Code § 76-6-702 which states:

> (1) A person is guilty of lewdness if the
> person . . . performs any of the following
> acts in a public place or under circumstances
> which the person should know will likely
> cause affront or alarm to, on, or in the
> presence of another who is 14 years of age or
> older: . . . (b) exposes his or her genitals,
> the female breast below the top of the
> areola, the buttocks, the anus, or the pubic
> area . . . .

Utah Code Ann. § 76-6-702 (1953).

The allegations in Plaintiff's Complaint, as well as the
attached exhibits, show that Defendants had probable cause to
support the lewdness charge brought against Plaintiff.  Defendant
Weigert had reasonably trustworthy information, based on the
statements of Defendants Vernon and Wellhoff who observed the

incident, that Plaintiff had exposed his buttocks while on the recreation yard in a manner which caused affront or alarm to the officers themselves and to other inmates.  Although Plaintiff denies intentionally exposing himself, he admits that he wore shorts to the recreation yard which were torn or altered to be more revealing and that he was observed wearing the altered shorts by Defendants Vernon and Wellhoff.  These facts, combined with Vernon and Wellhoff's statements that they saw Plaintiff lean over exposing his buttocks, and that they received complaints from other inmates, gave Weigert probable cause to believe Plaintiff had committed the offense of lewdness. Plaintiff has not alleged any facts showing that Weigert had reason to seriously doubt the trustworthiness of Vernon and Wellhoff's statements.  Thus, because there was probable cause to support the lewdness charge, the Court concludes that Plaintiff's allegations fail to state a claim for malicious prosecution.

### B. Legal Access Claims

Plaintiff's second cause of action asserts that Plaintiff was denied access to the courts in violation of the First, Fifth and Fourteenth Amendments.  Plaintiff appears to allege three separate legal access claims: First, Plaintiff challenges Defendants failure to provide notary services to inmates who wished to make sworn statements in Plaintiff's defense.  Second,

Plaintiff challenges Defendants alleged opening, reading and investigation of "legal" correspondence between Plaintiff and other inmates at PCF.  Finally, Plaintiff alleges that Defendants retaliated against him for filing grievances and records requests by transferring him back to the Utah State Prison.

It is well-recognized that prison inmates "have a constitutional right to 'adequate, effective, and meaningful' access to the courts and that the states have 'affirmative obligations' to assure all inmates such access." *Ramos v. Lamm, 639 F.2d 559, 583 (10th Cir. 1980), cert. denied, 450 U.S. 1041, 101 S. Ct. 1759 (1981)*.  In *Bounds v. Smith, 430 U.S. 817, 97 S. Ct. 1491 (1977)*, the Supreme Court expounded on the obligation to provide access to the Courts by stating "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id. at 828* (footnote omitted).  The right to access the courts includes being provided notarial services to authenticate legal documents at state expense, if necessary.  *Id. at 824-25*. However, to successfully assert a constitutional claim for denial of access to the courts, a plaintiff must allege not only the inadequacy of the library or legal assistance furnished but also

32

"that the denial of legal resources hindered [the plaintiff's] efforts to pursue a nonfrivolous claim." *Penrod v. Zavaras*, 94 *F.3d 1399, 1403 (10th Cir. 1996)*; *Carper v. Deland*, 54 F.3d 613, 616 (10th Cir. 1995).  In other words, a plaintiff must show "that any denial or delay of access to the court prejudiced him in pursuing litigation." *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996).  Moreover, the non-frivolous litigation involved must be "habeas corpus or civil rights actions regarding current confinement." *Carper*, 54 F.3d at 616; *accord Lewis*, 116 S. Ct. at 2181-82.

Plaintiff has not alleged any facts showing that the denial of notarial services or alleged interference with his legal mail substantially hindered his efforts to pursue any non-frivolous legal claims.  Regarding the denial of notarial services Plaintiff alleges that the documents involved were affidavits or witness statements prepared by other inmates in regard to the criminal charges filed against Plaintiff.  As an initial matter, it is questionable whether Plaintiff has standing to pursue claims for withholding of notarial services from other inmates. Although the alleged legal documents involved may have been intended to benefit Plaintiff he was not the person who was actually denied legal services.  More importantly, even if Plaintiff has standing to raise such claims he cannot show any

33

prejudice because the criminal charge against Plaintiff was ultimately dismissed.  And, as pointed out in the responses to Plaintiff's grievances, Plaintiff had appointed counsel to assist him with his defense and did not require the assistance of PCF officials to mount a defense.  If Plaintiff's appointed counsel felt the witness affidavits were necessary he could have made arrangements to obtain them without PCF assistance.

Plaintiff also cannot show any prejudice resulting from the alleged opening, reading and investigation of the purported "legal mail" which other PCF inmates attempted to mail to Plaintiff via the contract attorneys.  Even assuming that such inmate-to-inmate correspondence is protected "legal mail" Plaintiff cannot show that he suffered any adverse legal outcome because of the interference.  Nor does Plaintiff have standing to assert legal access claims on behalf of those who were allegedly interrogated or harassed for attempting to send letters to Plaintiff.

Finally, Plaintiff has not alleged sufficient facts to support his assertion that he was transferred from PCF in retaliation for, or to hinder him from, filing grievances and records requests.  The Court rejects Plaintiff's assertion that retaliation can simply be "reasonably inferred from a chronology of the facts" alleged in his Complaint.  Plaintiff states that he

was originally transferred to PCF to participate in SOTP but he was removed from the SOTP waiting list after being disciplined for the incident on the recreation yard.  From this perspective Plaintiff's transfer back to USP appears to be simply a natural result of his ineligibility for SOTP.  Moreover, there is no evidence that the transfer actually hindered or prevented Plaintiff from pursuing his grievances or records requests.  In fact, it is conceivable that the transfer improved Plaintiff's ability to obtain records and pursue legal action by affording him better access to the contract attorneys and records offices.  Thus, the Court finds Plaintiff's retaliation theory insufficient to support a legal access claim.

Because Plaintiff fails to allege specific facts showing that he was significantly burdened in pursuing any non-frivolous legal claims, or that he suffered retaliation for pursuing such claims, the Court concludes that Plaintiff's Complaint fails to state a claim for denial of access to the courts.

### C. Equal Protection Claim

Count Three of the Complaint asserts that Plaintiff was denied equal protection of the laws, in violation of the Fourteenth Amendment, based on his sexual orientation.  Plaintiff does not specifically state what actions by Defendants constituted discrimination on the basis of sexual orientation.

35

Plaintiff generally alleges, however, that he was singled out and treated more harshly than other inmates because he is gay.

"The equal protection clause provides that '[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1). "Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249 (1985)). Where an equal protection claim does not implicate either a fundamental right or a protected class, the court applies a rational basis test. *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). Under the rational basis test a challenged government action complies with equal protection if the government's classification bears "a rational relation to some legitimate end." *Id. at 1213*. The Tenth Circuit has expressly rejected the notion that homosexuality is a suspect classification. *See Walmer v. Dep't of Defense*, 52 F.3d 851, 854 (10th Cir. 1995).

If a government classification is neutral, that is, if it does not on its face implicate a protected class, heightened scrutiny might still apply if the application of the neutral policy has a disproportionate effect on a protected group. *See*

36

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555 (1977); *Washington v. Davis*, 426 U.S. 229, 241-42, 96 S. Ct. 2040 (1976).  In order to be entitled to heightened scrutiny, however, a plaintiff challenging the facially neutral governmental action must also establish that the government was acting with a discriminatory intent.  *See Arlington Heights*, 429 U.S. at 264-65, 97 S. Ct. 555; *Washington*, 426 U.S. at 239-42, 96 S. Ct. 2040; *see also Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988).  Under heightened scrutiny a regulation is valid if it is substantially related to achieving important governmental objectives.  *See Concrete Works of Colo., Inc. v. City and County of Denver*, 321 F.3d 950, 959 (10th Cir. 2003).

Plaintiff's conclusory assertion that he was mistreated based on his sexual orientation is not sufficient to state a viable equal protection claim.  Plaintiff has not identified any regulations or policies which indicate a bias against homosexuals, nor has Plaintiff alleged facts from which an inference could be drawn that Plaintiff was singled out for punishment because he is gay.  Although Plaintiff alleges that PCF officials conducted a broad investigation into alleged "homosexual activities" on Plaintiff's cell block it is clear that the sexual nature of the behavior was the primary concern,

not the gender of the inmates involved.[5]  The disciplinary
charges brought against Plaintiff were neutral as to sexual
orientation.  Moreover, the infractions for which Plaintiff was
actually convicted--making derogatory comments to staff and
disorderly conduct--were completely unrelated to sexual conduct.
Plaintiff does not allege that prison regulations allow
heterosexual inmates to engage in the type of behavior for which
Plaintiff was reprimanded, namely, wearing torn or altered
clothing and having inappropriate physical contact with other
inmates.  Nor has Plaintiff alleged specific facts showing that
heterosexual inmates are punished less severely for similar
infractions.

Finally, even assuming that the prison regulations at issue
have a disparate impact on homosexuals, the challenged policies
would clearly withstand even heightened scrutiny.  There can be
little doubt that prohibitions against wearing torn or altered
clothing and having intimate physical contact with other inmates
are substantially related to achieving important governmental
objectives including maintaining institutional security and

---

[5]  By definition, any sexual activity between inmates in a
gender segregated cell block would necessarily be homosexual in
nature.  Thus, it cannot be inferred that enforcement of
regulations against sexual conduct between inmates in such a
setting is intended to target homosexuals.

38

ensuring the safety of inmates and staff.  In fact, Plaintiff

does not appear to contest the validity of the regulations

themselves, he simply asserts without any factual support that he

was targeted for enforcement because he is gay.  The Complaint,

however, does not provide 'plausible grounds' to believe that

discovery will reveal evidence to support this assertion.

Thus, the Court concludes that Plaintiff's Complaint fails

to state a claim for denial of equal protection of the laws.

### D. Cruel and Unusual Punishment

Plaintiff's fourth cause of action asserts that Defendants'

actions amounted to cruel and unusual punishment in violation of

the Eighth Amendment.  Plaintiff's only supporting allegation for

this claims states:

> The nature, and culmination of the treatment
> inflicted upon those defendants of the PCF
> when these events occurred constitute
> punishment and/or treatment amounting to an
> atypical and significant hardship far
> exceeding that which can reasonably be
> considered to be within acceptable paramaters
> [sic] of plaintiff's imposed sentence, and
> which fail to meet the evolving standards of
> decency which mark the progress of a mature,
> democratic society.

(Compl. at 20.)  This statement is merely a jumble of legal

jargon haphazardly pieced together without any factual support.

As such, it is not sufficient to give Defendants fair notice of

the grounds on which Plaintiff's claim rests.  Moreover, based on
a thorough review of Plaintiff's Complaint the Court finds no
basis in law or fact for a claim of cruel and unusual punishment.
Thus, Plaintiff's Eighth Amendment cause of action is dismissed
for failure to state a claim.

**CONCLUSION AND ORDER**

After thoroughly reviewing Plaintiff's Complaint and supporting documentation the Court concludes that Plaintiff's allegations fail to state a viable claim for relief under Section 1983.  Moreover, given the exhaustiveness of Plaintiff Complaint and exhibits, and the well-settled nature of the law governing Plaintiff's claims, the Court further concludes that amendment of the Complaint would be futile.  This is not a case where Plaintiff's "factual allegations are close to stating a claim but are missing some important element that may not have occurred to him." *Reynoldson v. Shillinger*, 907 F.2d 124, 126-27 (10th Cir. 1990).

Accordingly, **IT IS HEREBY ORDERED** that this case is **DISMISSED** under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief can be granted.  *See* 28 U.S.C.A. § 1915 (West 2009).

DATED this 26th day of June, 2009.

BY THE COURT:

DEE BENSON
United States District Judge

41